UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
JOSE ERNESTO GARCIA,                                  :
                                                      :
     Petitioner,                              :
                                                      :  08 CIV 4733 (HB)
   -against-                                      :
                                                      :  **OPINION&**
UNITED STATES OF AMERICA                              :   **ORDER**
                                                      :
     Respondent.                              :
------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., District Judge:**[*]

  On October 14, 2005, I sentenced petitioner Jose Ernesto Garcia ("Garcia"), following his conviction by a jury verdict, to 151 months' imprisonment. On April 18, 2008, Garcia filed this petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2255. Garcia seeks to vacate his sentence on the ground that his attorney rendered ineffective assistance of counsel. For the reasons below, Garcia's petition is DENIED.

## I. BACKGROUND

### A. Underlying Facts of Garcia's Conviction

*1. Procedural Background*

  In a superseding indictment filed on March 29, 2005, Garcia was charged under 21 U.S.C. § 846 with one count of conspiring to distribute and to possess with intent to distribute five kilograms or more of cocaine. A jury trial began on April 13, 2005, and lasted until May 2, culminating in a guilty verdict. In an opinion dated August 18, 2005, this Court rejected Garcia's motion for a new trial, *United States v. Garcia*, 423 F.Supp.2d 101 (S.D.N.Y. 2005), and on October 14, 2005, sentenced him to 151 months' imprisonment followed by three years of supervised release. Garcia filed a timely appeal, in which he argued that he was prejudiced by this Court's suppression of impeachment material, that the Government did not properly obtain wiretap evidence, and that this Court abused its discretion in deciding to give an "*Allen* charge" to the jury.[1] In a summary order filed on April 18, 2007, the Second Circuit affirmed the

---

[*] Nathaniel Norman, a summer 2009 intern in my Chambers and a second-year law student at Brooklyn Law School, provided substantial assistance in the research and drafting of this opinion.
[1] *See Allen v. United States*, 164 U.S. 492 (1896).

1

judgment of this Court and sustained Garcia's conviction. *United States v. Vazquez*, 223 Fed. Appx. 43, 44 (2d Cir. 2007). This Petition followed.

      *2. Testimony of Jesus Dominguez, the Government's cooperating witness*[2]

At trial, the Government's proof established the existence of a triangular cocaine distribution enterprise: the drugs originated in Mexico, entered this country through the border to Southern California, and made their way to the Northeast United States, where they were delivered for distribution. A Government witness, Jesus Dominguez ("Dominguez"), provided many details of the fundamental elements of this operation. Dominguez made his living as a truck driver. In December of 2002, Dominguez was approached by Juan Garcia,[3] who asked if Dominguez had any interest in being a partner in a trucking business. Dominguez agreed and was soon hauling loads of machinery and building materials. Dominguez testified, however, that by January of 2003, Juan Garcia offered to pay Dominguez more money if he transported packages of cocaine in a hidden compartment in the truck. Dominguez said that, before his arrest, he made a total of between twelve and fifteen cocaine runs for Juan Garcia, transporting over 1,000 kilograms of cocaine to the East Coast, and between $10 million and $12 million in currency back to the West Coast.

After Dominguez was arrested on his last cross-country trip, he spoke with police and federal agents, pled guilty to transporting cocaine, forfeited a large sum of money to the United States, and signed a cooperation agreement with the Government. In this agreement, Dominguez agreed to testify against Garcia and others in the hope that such assistance might enable him to qualify for a lower sentence pursuant to United States Sentencing Guideline ("U.S.S.G.") 5K1.1.

Dominguez testified that he picked up the drugs for the last seven to ten trips from a house in Rancho Cucamonga, California. Dominguez first met Petitioner, Ernesto Garcia, at this "stash house." According to Dominguez, the house was sparsely furnished with only a sofa downstairs and possibly a radio boom box. Dominguez testified that, at first, the cocaine was packaged in "bricks" and was sitting in duffel bags in the stash house living room. Dominguez said that he counted the bricks of cocaine to make sure he knew how many to take and that Garcia was standing next to him as he did so. According to the testimony, Garcia then helped

---

[2] The following facts are derived from testimony at Petitioner's criminal trial. *See United States v. Garcia, et al.*, No. 04 Cr. 603 (HB).

[3] Juan Garcia is a cousin of Jose Ernesto Garcia. To avoid confusion, references to Juan Garcia will use his full name, while references to Jose Ernesto Garcia will read only "Garcia" or "Petitioner." Juan Garcia pled guilty to a cocaine conspiracy charge and was sentenced to 292 months' imprisonment.

Dominguez carry the duffel bags out to a waiting van. The second time Dominguez returned to the stash house, Dominguez said that the drugs were in a living room closet. He also testified that there "was never anybody else besides me and him [Garcia]" present at the house.

On subsequent trips to the stash house, Dominguez learned that the cocaine was kept under the stairwell. The compartment under the stairwell contained up to 250-300 bricks of cocaine, stacked four or five high. During the trips to the stash house, Garcia, having loosened the floorboards to obtain access to the stairwell, would pass bricks of cocaine to Dominguez, who placed them in a duffel bag. Garcia would mark the bricks with numbers in order to keep track of how many packages remained in the house. Both Garcia and Dominguez wore gloves to avoid leaving any fingerprints. Garcia and Dominguez performed this ritual five or six times and Dominguez left each time with about 100 kilograms of cocaine.[4]

Dominguez also testified that he delivered money to Garcia at his trailer on four or five occasions—a couple hundred dollars each time—but did not ask about its purpose.  According to Dominguez, Juan Garcia said Garcia received the money to take care of the stash house so as not to "arouse attention" from the neighbors.

   *3. Testimony of Farhad Omidvar, the stash house landlord*

Farhad Omidvar, the landlord of the property used to stash the cocaine, testified that he rented a single-family dwelling to Garcia in June, 2003. At that time, Garcia signed a year-long lease agreement. During the rental process, Garcia provided various personal data to Omidvar, including his social security number, telephone numbers, and employment information. Omidvar also ran a credit check on Garcia before renting to him and said that Garcia always paid his rent on time. Some time before the lease expired, Garcia sent a fax to Omidvar mentioning Garcia's wish to break the lease because he and his family were leaving the state. When Omidvar returned to the property to inspect it for damage, he said it appeared "untouched," that is, in the same condition in which it was rented. Omidvar noticed only some marks on the first floor carpet where a sofa had been, but the upstairs was "brand new," with no marks or furnishings or any kind. Omidvar permitted agents from the Drug Enforcement Administration ("DEA") to search the property, where they found the secret staircase compartment.

   *4. Garcia's defense*

---

[4] On the final trip, Dominguez testified that he had picked up just 46 kilograms, an amount necessary to complete a contract with receivers on the East Coast.

Garcia was arrested by DEA agents on July 26, 2004. At trial, Garcia testified on his own behalf. He and his counsel tried to counter the Government's assertion that he managed the stash house. Garcia said that he rented the house for his cousin, Juan Garcia, because Juan Garcia had bad credit. Garcia testified that he would receive rent money from Juan Garcia to pay for the house. Although Garcia admitted to having met Dominguez "a few times," he denied any involvement in a cocaine conspiracy. Garcia denied loading cocaine with Dominguez, marking numbers on bricks of cocaine, storing drugs, or agreeing to move cocaine anywhere.

### B. Petitioner's Claims for Habeas Corpus

Garcia brought this petition for a writ of *habeas corpus*, pursuant to 28 USC § 2255. Garcia alleges that he was deprived of his right to effective assistance of counsel under the Sixth Amendment. *See Strickland v. Washington*, 466 U.S. 668, 687-96 (1984). Petitioner's claims are fourfold. First, Petitioner alleges that his attorney failed to argue that the "stash house" was leased "legitimately" and that it was returned to the landlord "in the same condition as when it was first leased." Second, Petitioner claims that, since no drug residue was found in the stash house or its environs, the Government's informant was "not telling the truth" when he testified that he received drugs there seven or ten times. Third, Petitioner alleges that his attorney failed to point out to the jury that Petitioner was not intercepted on any incriminating, wiretapped telephone calls. Finally, Petitioner alleges that his attorney failed to argue that because Petitioner did not "person[ally] benefit[ ] from the drug transaction" he cannot be guilty of a conspiracy. Petitioner claims that these arguments were not presented at trial because his attorney "discouraged Petitioner" from pursuing them.

## II.   STANDARD OF REVIEW

In order to prevail under 28 U.S.C. § 2255, a petitioner must show that 1) his sentence was imposed in violation of the Constitution or laws of the United States; *or* 2) the court was without jurisdiction to impose the sentence it imposed; *or* 3) the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. 28 U.S.C. § 2255(b); *see also Rosario v. United States*, 625 F. Supp. 2d 123, 126 (S.D.N.Y. 2008).

### III.     DISCUSSION

A claim of ineffective assistance of counsel under the Sixth Amendment must satisfy the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984).  A petitioner must affirmatively show that counsel's performance fell below an objectively reasonable standard of performance, and that that deficient performance prejudiced the outcome of the proceeding.  *See Strickland,* 466 U.S. at 687; *Brown v. Greene*, 577 F.3d 107, 118 (2d Cir. 2009).  .

Under the "performance" prong, this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *See Griffith v. United States*, No. 03 Civ. 7860(HB), 2005 WL 2454071, at *5 (S.D.N.Y. Oct. 6, 2005) (internal citations omitted); *see also Greene*, 577 F.3d at 110.  A defendant may not succeed on a claim of ineffective assistance from counsel merely by arguing that his counsel's trial strategy was inadequate.  *United States v. Sanchez*, 790 F.2d 245, 253 (2d. Cir. 1986).  To the contrary, "Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance."  *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).  A strategic decision is a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client."  *Greene,* 577 F.3d at 129 (internal quotations omitted).  "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Prejudice is shown if, but for the deficient performance, there is a "reasonable probability" that the outcome of the proceeding would have been different.  *Woodard v. United States*, No. 04 Civ. 9695 (HB), 2005 WL 2978678, at *9 (S.D.N.Y. Nov. 7, 2005) (citing *Smith v. Murray*, 477 U.S. 527, 534 (1986)).  A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Smith*, 477 U.S. at 534; *see also United States v. Aguirre*, 912 F.2d 555, 561 (2d Cir. 1990) ("The court's central concern is... discerning ... [whether] the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.").  It is insufficient to show that an error or omission had "some conceivable effect on the outcome of the proceeding, because virtually every act or omission of counsel would meet that test." *Strickland*, 466 U.S. at 693.  Petitioner must show that his counsel's "unprofessional errors" had a "reasonably

probability" of changing the outcome of the case.  *Id*. at 669.  A court deciding an ineffectiveness claim must look to the totality of the evidence before the jury.  *Id*.  A court need not address both prongs if a petitioner fails to make a sufficient showing on one.  *Id.* at 697.

      A.   Counsel's Conduct Fell Within The Range Of Reasonable Professional Assistance

          *1.  Lease of the stash house and its condition upon return*

Petitioner alleges that his attorney failed to argue that the "stash house" was leased "legitimately" and that it was returned to the landlord "in the same condition as when it was first leased." Pet. at 5.  Simply put, these claims are without merit, since Petitioner's counsel addressed them thoroughly during both cross-examination and closing statements.

As to the "legitimate" leasing of the house, counsel cross-examined Farhad Omidvar, the lessor of the property.  Tr. 295-305.  During the course of this examination, counsel elicited much testimony from Omidvar about various elements of the rental agreement between Omidvar and Petitioner. Omidvar testified that Petitioner provided a wealth of personal, identifying information, including his real name, social security number, telephone number where he could be reached, the name of his employer, job title, and banking information.  Tr. 299-302.  Under cross-examination from Petitioner's counsel, Omidvar testified that he ran a check of Petitioner's credit history and found it to be good.  Tr. 302.  Omidvar added that Petitioner "never paid a late payment.  It was always on time."  Tr. 300.

Moreover, during closing statements, counsel relied on this testimony to argue that Petitioner's ostensibly open and honest dealings with the landlord belied the Government's contention that Petitioner was part of a drug enterprise cloaked in secrecy.  Tr. 1826.  Counsel's intention, in other words, was to try to convince the jury that someone engaged in a drug conspiracy would not have used actual identifying information to rent a stash house. Furthermore, counsel conceded that Petitioner admitted on the stand that he rented the house not for himself but for his cousin.  Tr. 1838.  And, counsel argued, even if Petitioner had been less than candid about the person for whose benefit he signed the lease, "[t]hat's what family is all about," namely, to provide support or assistance to less fortunate relatives.  Tr. 1839.

In short, the trial record makes clear that Petitioner's counsel was well aware of the circumstances surrounding the rental of the stash house and, indeed, addressed them squarely in both cross-examination and summation.  As such, I find this basis for claiming ineffective assistance of counsel to be without merit.

As for Petitioner's claim that counsel failed to argue that the stash house was returned in the same condition in which it was rented, this was, in fact, part of the Government's case. During the Government's direct examination of Omidvar, he testified that Petitioner told him that he never lived in the house after renting it. Tr. 293. Additionally, Omidvar said that, upon re-entering house at the end of the lease, the house appeared "[u]ntouched, the same as it did [when] I rented it out to him." Tr. 294. Although there were marks in the first floor living room where a sofa had been placed, there was no furniture on the premises, no marks on the walls, and the carpet upstairs was "brand new." *Id*. This testimony was a central feature of the Government's closing statement, in which the Government essentially averred that the house was in an unfurnished, "untouched" condition because it had not been lived in, but rather used solely as a place for storing cocaine. Tr. 1758-60. In sum, the Government suggested that "[t]here is no other explanation, there is no other use that we have seen for this house" besides that of a cocaine storage facility. Tr. 1760. Given that the Government used this evidence to demonstrate its own theory of Petitioner's guilt, it comes as no surprise that Petitioner's counsel declined to argue these very same facts in front of the jury. Consequently, I find that that counsel acted neither unreasonably nor ineffectively in refusing to present this argument.

### 2. *Absence of drug residue in the stash house*

Petitioner alleges that his counsel failed to impeach the testimony of the Government's cooperating witness, Jesus Dominguez. Pet. at 5. Specifically, Petitioner claims that while counsel was presumably aware of Dominguez's testimony—that drugs were transported to and from the stash house and were stored therein—counsel failed to indicate that drug residue was not found on the premises. This dereliction, Petitioner alleges, points up a lost opportunity to prove that the Government's main witness was "not telling the truth." *Id*.

Petitioner basically argues that the presence of drugs necessarily begets the presence of drug residue, that one cannot exist without the other. Aside from the fact that Petitioner has committed the common fallacy of denying the antecedent ("If there is drug residue, there must have been drugs. There is no residue. Therefore, there were no drugs."), the testimony simply does not bear him out. Petitioner and Dominguez evidently took pains to ensure that the bricks of cocaine were organized and systematized in the stash house. Dominguez testified that at any one time 250-300 blocks of cocaine were stacked up in neat rows in a hiding space under the stairwell. Tr. 795. The bricks were wrapped in vacuum-packed plastic. Tr. 795-796, 853.

7

Petitioner numbered the bricks in order to keep track of them. Tr. 796, 854. Petitioner and Dominguez wore gloves so as not to leave any fingerprints while unloading or transporting the bricks. Tr. 795. Dominguez also testified that he placed the cocaine directly into a duffel bag after Petitioner brought it out from underneath the staircase. *Id*. Furthermore, there was no testimony that the stash house was anything other than a stopping place for the narcotics as they traveled east. That is, there was no testimony that the drugs were weighed, cut, bagged, or otherwise handled at the house. In view of these precautions and procedures, and the evident care with which Petitioner handled the cocaine, the absence of drug residue at the stash house does not impugn Dominguez's credibility. Hence it is entirely plausible that Petitioner's counsel made a conscious, strategic decision to forego a line of impeachment questioning which she believed would be fruitless. *See, e.g., United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) ("Counsel's election to forgo an unsupported argument" is a strategic decision). I thus find Petitioner's claim of ineffective assistance of counsel on this score to be meritless.

Moreover, counsel did subject Dominguez to vigorous cross-examination, attempting to undermine his credibility on a variety of other issues, including the following: Dominguez's numerous conversations and negotiations with prosecutors and personnel from the Drug Enforcement Agency ("DEA"); his arrest, criminal charges, and subsequent plea agreement; his prior involvement in the Latin Kings gang; dishonest and unethical behavior at truck driving school; prior cocaine and marijuana use; and other issues. Tr. 947-1028. This lengthy and comprehensive examination is further evidence that counsel made a responsible and dutiful, albeit unsuccessful, effort to impeach the Government's main witness. *See United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature" and will not support a claim of ineffective counsel); *see also Love v. McCray*, 165 Fed. Appx. 48, 49-50 (2d Cir. 2006). As such, I find no reason to conclude that counsel provided ineffective representation on this score.

      3.   *Wiretapped telephone calls*

Petitioner alleges that counsel failed to point out to the jury that Petitioner's voice was not heard on any incriminating, wiretapped telephone calls. Petitioner argues that the only tapped calls on which his voice was heard dealt with "legitimate" matters such as "purchas[ing] an USV [sic]" and "putting in a sound system into a Toyota truck." Pet. at 5.

Counsel made this very argument before the jury during his summation. Counsel argued that the extended period of the Government's wiretapping efforts, and the relative paucity of calls which featured the Petitioner, were evidence that Petitioner was not engaged in any drug conspiracy.

> . . . [S]ix months they told you, six months they investigated wiretaps, listening in to the phone calls. If Ernesto Garcia is on those, Agent Martinez told you that, agent Martinez told you that he heard him on there so many times, I know his voice. Where is he in the binder? There is one call in there, one thing in there. Go ahead and look at it. It's about a minivan pick-up truck or something, whichever way you – it's not in there. So I can't say not a single call, maybe, I don't know cause not a question was put about what that means. Skimmed right over that one, days and days about coded conversation. If he was who they say he is and they had those calls it would be there. It would be in that binder.
>
> . . . He is the one with the stash house they'll have you believe. Where is his secret coded, thousands of calls, six months of investigation. . . .

Tr. at 1828. In short, Petitioner's allegation of ineffective assistance of counsel is contradicted by the facts of what his counsel actually argued at trial.

### 4. *Benefiting from the conspiracy*

Finally, Petitioner alleges that counsel failed to show that Petitioner did not personally gain anything from the drug transactions. Pet. at 5. Petitioner asserts that "no money means no conspiracy" and, since he received "[n]o substantied [sic] amounts of money" for his alleged participation in the drug conspiracy, he maintains that he cannot be guilty of a conspiracy. *Id*.

Petitioner's claim ignores the facts and misstates the law of conspiracy. Involvement in a criminal conspiracy may be proven even though a defendant has no financial stake in the objective. *United States v. Lopac*, 411 F. Supp. 2d 350, 361 (S.D.N.Y. 2006) (citing *United States v. Torres*, 901 F.2d 205, 245 (2d Cir. 1990)). Guilty verdicts of conspirators without financial interests are sustainable. *Lopac*, 411 F. Supp. 2d at 362. In my charge to the jury, I made this clear and said it was not "necessary for the defendant you are considering to receive any monetary benefit from this participation in a conspiracy, or have a financial stake in the outcome…It is enough if he participated in the conspiracy unlawfully, intentionally, and knowingly." Tr. 1718. Similar instructions have been deemed to be "balanced and comprehensive." *See Torres*, 901 F.2d at 245 (explaining that such an instruction is proper because it avoids the misleading inference that there must be some showing of financial interest

9

in the stake of the outcome); *see also United States v. Henry*, 325 F.3d 93, 105 (2d Cir. 2003). Hence, Petitioner's claims that he neither benefited personally nor received any substantial sums as a result of his participation in the conspiracy are unavailing. Counsel's alleged "failure" to misrepresent the law of conspiracy is hardly grounds for challenging her quality of representation.

I must add, however, that the evidence brought out at trial contradicts Petitioner's claim that he did not personally benefit. Petitioner received payment for providing bodyguard services to his cousin Juan Garcia and admitted as much during cross-examination. Tr. 1121, 1606-07. Petitioner also testified that his cousin gave him money to pay rent on the stash house. Tr. 1593, 1595. The Government's cooperating witness, Dominguez, testified that Petitioner received money from Juan Garcia from time to time, although Dominguez was not sure what the money was for. Tr. 800-01. Petitioner's counsel, nevertheless, put forth the very argument which Petitioner claims was never made, asserting that any payments Petitioner may have received were for legitimate uses, such as paying rent or providing security services. Tr. 1839-40.

> B. <u>Even If Counsel Had Committed The Alleged Errors And Omissions, There Is No Reasonable Probability That The Outcome of the Proceeding Would Have Been Different</u>

It bears repeating that a claim of ineffective assistance of counsel will not succeed merely on a showing that an error or omission would have had "some conceivable effect" on the proceedings. *Strickland*, 466 U.S. at 693. It is a truism to say that any word or deed—said or unsaid, done or undone—could have "some" effect, however minute or insignificant, on the proceedings. A word has an effect simply by its being said, an act by its being done. Petitioner must show that his counsel's errors or omissions actually had a reasonable chance of changing the outcome of the case. *Id*. at 669.

In this instance, even if Petitioner's counsel fell short of the objective standard of reasonableness against which it must be judged, Petitioner has failed to show that there is any reasonable probability that the outcome of the trial would have been different. In my Opinion that denied Petitioner's motion for a new trial, I noted that the extent of the Government's proof was so "overwhelming" that it signified a "national, and likely international, narcotics conspiracy . . . ." August 18, 2005 Order, at 5. Aside from unearthing a multi-million-dollar, transnational drug conspiracy, the Government's recitation of Petitioner's involvement was voluble and

convincing. Petitioner's admissions, the statements of the stash house landlord, and the corroborating testimony of the Government's cooperating witness, not to mention a constellation of documentary and physical evidence, all paint a clear portrait of Petitioner as the informed and savvy manager of the cocaine "weigh station" in Los Angeles.

## IV. CONCLUSION

For the foregoing reasons, Garcia's petition to vacate his sentence pursuant to 28 U.S.C. § 2255 is DENIED. A certificate of appealability will not issue because Petitioner has failed to make a substantial showing of the denial of a federal right. *See* 28 U.S.C. § 2253. The Clerk of the Court is directed to close this matter and remove it from my docket.

**SO ORDERED.**
April 20, 2010
New York, New York

_____
Hon. Harold Baer, Jr.
U.S.D.J.